# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cr-30048** |
| | ) | |
| **RAFAEL MERCADO BERRIOS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Before the Court is Defendant Rafael Mercado Berrios' Motion to Suppress Statements and Evidence (d/e 47).  For the reasons set forth below, Defendant's motion is DENIED.

## I. BACKGROUND

From August 24, 2020, to August 28, 2020, the Federal Bureau of Investigation conducted an undercover operation with the assistance of other state and federal agencies.[1]  During the

---

[1] At the evidentiary hearing on the Motion to Suppress, Defendant moved to admit the operational plan for the undercover investigation.  Defendant tendered to the Court a copy of the operational plan for the undercover investigation conducted in Rock Island and the Government tendered a copy of the operational plan for the undercover investigation conducted in Springfield. The Court has reviewed both plans and finds that they are not relevant to the issues raised in Defendant's Motion to Suppress and therefore refuses

investigation, undercover agents acting as chatters posed as minors on online chat applications and social media websites.  Defendant engaged one of the undercover agents, who was posing as 'Alexis,' on the MeetMe application before moving the conversation to text messages.  In the text message conversation, Defendant and Alexis arranged to meet on August 28, 2020.  Unbeknownst to Defendant, the location for the meeting was a target house used by the agencies involved in the undercover operation.  When Defendant arrived at the target house, he was arrested by law enforcement officers.

After taking Defendant into custody, agents attempted to interview Defendant while still at the target house.  The interview at the target house began at 5:50 p.m. according to the recording of the interview.  Defendant was read his <u>Miranda</u> rights, and he signed an advice of rights form consenting to speak to the agents without a lawyer present.  Shortly after agents began questioning Defendant though, Defendant requested a lawyer and the agents ended their questioning.  After collecting Defendant's personal

---

admission of the operational plan on that basis without reaching the Government's claims of privilege.

identifying information and a DNA swab, the agents advised Defendant that he would be going to jail.  At this point, Defendant began breathing heavily, became highly emotional, and collapsed on the floor.  Agents called 911, and an ambulance arrived to transport Defendant to a local hospital.  Defendant was initially unresponsive while being transported to the hospital, but he regained consciousness about halfway through the ambulance ride and became combative with the emergency medical personnel.

Defendant arrived at the hospital at approximately 7:15 p.m. and was noted to be stuporous.  According to the emergency room doctor who initially evaluated Defendant, Defendant's vital signs were unremarkable, but he did not respond to a sternal rub, yet he did appear to be protecting his airway.  Shortly after arriving at the hospital, Defendant spontaneously regained consciousness and once again became combative and began yelling.  Defendant was then administered 2 mg of Ativan (lorazepam) intravenously at approximately 7:23 p.m.  Lorazepam is a benzodiazepine used to treat anxiety.

Approximately two hours later, Detective Howard, who had remained at the hospital with Defendant, contacted one of the

agents to ask them to return to the hospital because Defendant had asked to speak with them.  Special Agents Roth and Bowers, along with Detective Howard, then met with Defendant in a hospital room. Defendant was seated upright on the hospital bed and the three law enforcement officers stood around the end of the bed about six feet from Defendant.  The second interview of Defendant began at approximately 9:32 p.m. according to the recording of that interview.

The agents again advised Defendant of his <u>Miranda</u> rights at the beginning of the second interview.  After advising Defendant of his right to speak to a lawyer before answering any questions, Defendant said "How is that possible ? . . . [because] I'm here right now. So, how would a lawyer come in right now to help me?" Detective Howard advised Defendant that, if Defendant had an attorney on retainer who could come to the hospital, that would be one way in which an attorney could be present.  Otherwise, Detective Howard explained, an attorney would be assigned to Defendant.  Defendant then said, "I can get an attorney, but I have to call them and they have to come over."  At that point, Detective Howard again advised Defendant of his right to talk to a lawyer

before answering any questions and asked if Defendant understood. Defendant responded, "Yes, I understand." Detective Howard then finished advising Defendant of his <u>Miranda</u> rights and provided a second advice of rights form for Defendant to sign. Defendant asked if it said anywhere on the form that Defendant was under arrest. Detective Howard asked Defendant whether he remembered being handcuffed and advised that he was in custody. Special Agent Roth further explained Defendant's <u>Miranda</u> rights to him and told Defendant that the agents would try to have a conversation with Defendant to get his side of the story. Defendant stated "But, even in custody doesn't really mean that I'm gonna go straight to jail" to which Detective Howard responded, "Like I said, I don't know the answer to that. Ok? And, I don't know that because I don't know what you're going to tell me?" At that point, Defendant said "Ok, ok, I'll start I guess." The agents then proceeded to question Defendant. During the questioning, the agents asked Defendant if they could search Defendant's cell phone and camera. Defendant asked clarifying questions about what the agents would be searching the devices for, and he was presented with a consent to search form for the camera and phone which was read to Defendant

and which Defendant then signed.  Defendant made incriminating statements during the interview and incriminating evidence was recovered from the search of the cell phone.

On September 16, 2020, Defendant was charged in a two-count Indictment (d/e 17).  Count One charged Defendant with attempted enticement of a minor in violation of 18 U.S.C. § 2422(b) and Count Two charged Defendant with use of interstate facilities to transmit information about a minor in violation of 18 U.S.C. § 2425.  On September 23, 2020, Defendant entered a plea of not guilty to both counts.

On May 17, 2021, Defendant filed his Motion to Suppress Statements and Evidence, seeking suppression of any statements made during the interview conducted with Defendant at the hospital and any evidence recovered from the search of Defendant's electronic devices.  First, Defendant argues that the statements at the hospital were obtained in violation of his Miranda rights because he effectively invoked his right to counsel.  Alternatively, Defendant argues that any waiver of his Miranda rights was not knowingly, voluntarily, and intelligently made under the totality of the circumstances.  Next, Defendant argues that his statements

themselves were not voluntary.  Finally, for the same reasons he seeks suppression of his statements, Defendant argues that the consent to search his electronic devices was constitutionally defective.

On May 21, 2020, the Government filed its Response to Motion to Suppress (d/e 64).  The Government contends that Defendant did not unequivocally invoke his <u>Miranda</u> rights during the hospital interview, that Defendant's <u>Miranda</u> waiver was knowing, voluntary, and intelligent, and the Defendant's consent to search his electronic devices was likewise valid for the same reasons.

On May 27, 2021, the Court held an evidentiary hearing on the Motion to Suppress.  The Court heard testimony from Special Agent Wright, the FBI case agent, Special Agent Roth, one of the two agents who conducted the hospital interview of Defendant, and Dr. Jude Regis, the emergency room physician who treated Defendant at the hospital.  At the conclusion of the hearing, Defendant sought to admit an Abstract prepared by Dr. Philip Pan. The Government subsequently sought, and was granted, leave to file an evaluation by Dr. Terry Killian (d/e 99) to respond to Dr. Pan's evaluation.  Defendant has filed a Response (d/e 100) to Dr.

Killian's report and to case law submitted by the Government.

## II. ANALYSIS

The parties do not dispute that the interview conducted at the hospital was a custodial interrogation. "A defendant's challenge to the admission of statements made during a custodial interrogation presents two separate questions: whether he received and validly waived his <u>Miranda</u> rights, and whether his statements themselves were voluntary." <u>United States v. Outland</u>, 993 F.3d 1017, 1021 (7th Cir. 2021) (citations omitted). The first question ensures that law enforcement officers convey <u>Miranda</u> warnings at the beginning of a custodial interrogation and secure a waiver of those rights before proceeding. <u>Id.</u> (citations omitted). The second question asks more broadly "whether, in the totality of the circumstances, the defendant's statements to authorities were voluntary." <u>Id.</u> (citations omitted). For the reasons that follow, the Court finds that Defendant did not unequivocally invoke his right to counsel during the hospital interview, that Defendant's <u>Miranda</u> waiver was valid, that the statements Defendant made during the hospital interview were voluntary, and that Defendant's consent to search his electronic devices was valid.

**A.   Defendant Did Not Unequivocally Invoke His Right to Counsel During the Interview at the Hospital.**

Defendant first argues that his statements made at the hospital should be suppressed because they were the product of custodial interrogation conducted after Defendant invoked his right to counsel.  Defendant argues that the statements he made regarding the right to counsel during the hospital interview constitute an effective invocation of that right and, therefore, the custodial interrogation should have ended at that point and that any statement made after he invoked the right must be suppressed.

"[W]hen an individual in custody 'states that he wants an attorney, the interrogation must cease until an attorney is present.'" United States v. Wysinger, 683 F.3d 784, 793 (7th Cir. 2012) (quoting Miranda v. Arizona, 384 U.S. 436, 474 (1966)).  An accused who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484–85 (1981).  Here, the parties do not dispute that Defendant was

in custody at the time of the hospital interview, the first part of the Miranda analysis. "The rule expressed in Miranda and Edwards next requires courts to engage in two distinct inquiries[: f]irst, courts must determine whether the suspect actually invoked his or her right to counsel[; s]econd, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." Wysinger, 683 F.3d at 793 (quoting Smith v. Illinois, 469 U.S. 91, 95 (1984)).

Because it is undisputed that Defendant was in custody at the time of the hospital interview, the Court must next determine whether Defendant invoked his right to counsel. To be effective, a request for counsel must be unambiguous. Davis v. United States, 512 U.S. 452, 459 (1994). "If a suspect makes an equivocal or ambiguous reference to a lawyer, a reference that a reasonable officer would interpret as a statement that the suspect *might* be invoking the right to counsel, there is no requirement that questioning end." Wysinger, 683 F.3d at 793 (citing Davis, 512 U.S. at 459)). In determining whether a suspect clearly invoked the right

to counsel, the Court must consider the circumstances in which the statement was made as well as the words employed.  <u>United States v. Shabaz</u>, 579 F.3d 815, 819 (7th Cir. 2009).

Here, Defendant unequivocally invoked his right to counsel during the initial interview at the target house when he stated "I want a lawyer."  Agents then terminated questioning and collected only Defendant's personal identifying information such as his full name and Social Security number.  The agents only approached Defendant again when Defendant asked that the agents come to the hospital to speak with him.  Thus, Defendant initiated the second interview.  When the Defendant was read his Miranda rights again for the second time that night, Defendant's questioning regarding the right to counsel (which he had unequivocally invoked just hours before) was not a clear invocation of the right.  Rather Defendant asked clarifying questions about the right, such as the logistics of how an attorney might be made available while Defendant was in the hospital.  On similar facts, such statements have been held not to constitute an expression of a present desire to consult with counsel.  For example, in <u>United States v. Shabaz</u>, 579 F.3d 815, 819 (7th Cir. 2009), the court held that the defendant's statement

"Am I going to be able to get an attorney" did not constitute a present desire to consult with counsel. Likewise, in <u>Lord v. Duckworth</u>, 29 F.3d 1216, 1220-21 (7th Cir. 1994), the Seventh Circuit held that the defendant's question "I can't afford a lawyer but is there anyway I can get one?" was not a clear request for counsel. Considering the words Defendant employed here then— "how would a lawyer come in right now to help me?" and "I can get an attorney, but I have to call them and they have to come over"— the statements did not evince a present desire to consult with counsel. Defendant's statement that he "can get an attorney" is not the same as stating that he wants an attorney, or that he would like to call an attorney. Similar to the defendant's statement in <u>Lord</u>, Defendant's statement here is best understood as a statement that Defendant could afford an attorney, particularly given the context in which Detective Howard had just explained that if Defendant had an attorney on retainer, that attorney could be present, otherwise an attorney would be assigned to Defendant. Defendant's statements at most indicate that he was contemplating whether he needed the assistance of a lawyer, not that he was requesting a lawyer at that time. Cf. <u>Wysinger</u>, 683 F.3d at 795 (defendant's

question "I mean, but can I call [a lawyer] now?" was, in context, an unequivocal request for counsel).

Likewise, consideration of the circumstances in which the statements were made strengthens the conclusion that the statements were not a clear invocation of the right to counsel. Recall that Defendant had unambiguously invoked his right to counsel just hours earlier.  At that point, questioning ceased.  But during the hospital interview, after making the statements addressed above, Defendant continued to engage with the agents, signed the advice of rights form, and indicated that he wished to begin the interview by saying "Ok, ok, I'll start I guess."

Having concluded that Defendant did not unequivocally invoke the right to counsel during the hospital interview, the Court moves to the next question—whether Defendant knowingly, intelligently, and voluntarily waived the right.

**B.**    **Under the Totality of the Circumstances, Defendant's <u>Miranda</u> Waiver was Knowing, Intelligent, and Voluntary.**

Alternatively, Defendant argues that his waiver of <u>Miranda</u> rights prior to the hospital interview was not knowing, intelligent, and voluntary under the totality of the circumstances.  Defendant

argues that the totality of the circumstances weighs against the voluntariness of the waiver in view of Defendant's prior invocation of his right to counsel combined with what Defendant contends was his "intoxication" at the time of the waiver due to the administration of lorazepam.

A valid waiver of Miranda rights must be knowingly, intelligently, and voluntarily made. Miranda, 384 U.S. at 444. "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). And to be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. A waiver is involuntary "when it was given in circumstances that were sufficient to overbear" the speaker's free will. Johnson v. Pollard, 559 F.3d 746, 753 (7th Cir. 2009) (citing Lynumn v. Illinois, 372 U.S. 528, 534 (1963)) (other citation omitted). "Factors considered in the analysis include the defendant's background, experience, and conduct." United States v. Huerta, 239 F.3d 865, 873 (7th Cir. 2001) (citing North Carolina

v. Butler, 441 U.S. 369, 374-75 (1979)).  "When the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." United States v. LeShore, 543 F.3d 935, 940-41 (7th Cir. 2008) (quoting United States v. Haddon, 927 F.2d 942, 946 (7th Cir. 1991)) (alteration omitted).

Here, Defendant contends that his use of medical marijuana earlier in the day and the administration of lorazepam in the emergency room made him particularly susceptible to coercive tactics by the agents and, therefore, weighs against voluntariness. Defendant has presented the expert report of Dr. Susan Skolly in support of this contention.  Dr. Skolly opines that Defendant was "under the influence of lorazepam" at the time of the hospital interview, that Defendant's behavior was consistent with the disinhibiting effects of lorazepam, and that "it is likely the Defendant was incapable of thinking through the consequences of his actions, while under the influence of lorazepam . . . ."  Def.'s Mot. to Suppress, Ex. A. 13-14.  At the end of the evidentiary hearing on Defendant's Motion to Suppress, Defendant also sought

to admit a Fitness to Stand Trial Evaluation prepared by Dr. Phillip Pan, titled as an 'Abstract.'  The Government has filed an Objection to the Admission of Defendant's Exhibit Entitled Abstract, d/e 91, arguing that Dr. Pan's report should be excluded on the basis of the report's untimely disclosure.

In response to Dr. Skolly's report, the Government has submitted the report of Dr. James O'Donnell.  <u>See</u> United States' Disclosure of Expert Witness, d/e 78.  The Government has also filed a report prepared by Dr. Terry Killian, which addresses Dr. Skolly, Dr. Pan, and Dr. O'Donnell's reports.  <u>See</u> Forensic Psychiatric Evaluation, d/e 99.  Defendant has further filed a Response in Opposition to the Use of Dr. Killian's Report as Improper Opinion on All Points Except Mental Health Diagnoses and Response to Additional Case Law on Experts.  d/e 100.  The Government subsequently sought, and was granted, leave to file a Reply to the Defendant's Response.  d/e 102.

Defendant objects to the admission of Dr. Killian's report based on Federal Rules of Evidence 701, 702, and 703, and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).  The Court understood Defendant to seek admission of Dr. Pan's report

for a limited purpose at the suppression hearing only.  Likewise, the Government has thus far not indicated its intent to use Dr. Killian's report at trial, but merely for purposes of the motion to suppress. Federal Rule of Evidence 104(a) makes explicit that the Court "is not bound by evidence rules, except those on privilege" at an evidentiary hearing on a motion to suppress.  Defendant argues that "Daubert's gatekeeping function 'applies to all expert testimony.'"  Resp. in Opposition to the Use of Dr. Killian's Report 6 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148 (1999)).  But the Seventh Circuit has stated that there is no requirement for a district judge to conduct a Daubert analysis during a suppression hearing.  See United States v. Ozuna, 561 F.3d 728, 736 (7th Cir. 2009).

The Court has reviewed the reports of each of the experts and the case law provided by the parties and finds the experts qualified to render the opinions given insofar as those opinions pertain to the suppression hearing.  Any objections to admissibility at trial will be addressed if or when they arise.

In addition to the opinions noted above, Dr. Skolly's report also states that in approximately ten percent of individuals,

lorazepam may have "disinhibiting effects."  According to Dr. Skolly, "[b]enzodiazepines including lorazepam may lead to a loss of restraint that governs normal social behavior and a reduced ability to concentrate on the external social cues that guide appropriate behavior."  Skolly Report ¶ 26.  Additionally, "benzodiazepine-induced inhibition of neurotransmission may result in a decrease in the restraining influence of the control and command area of the brain (the prefrontal cortex), leading to excitement, agitated toxic psychosis, increased anxiety, hostility, and rage in addition to the loss of inhibitory control."  Id.

At the evidentiary hearing, Dr. Regis testified that persons with personality disorders may be particularly susceptible to lorazepam's disinhibiting effects.  According to Dr. Pan's report, "[D]efendant exhibits significant Paranoid Personality Disorder traits . . . as well as Borderline personality traits," although Dr. Pan also expressed his reluctance to diagnose a personality disorder after only limited contact or experience with a patient.  Pan Report 16 (emphasis omitted).

Dr. O'Donnell states in his affidavit that after reviewing the recording of the hospital interview, "[t]here is no evidence of

[Defendant] being under the influence of lorazepam." O'Donnell Aff. ¶ 17. Dr. O'Donnell notes that Defendant spoke clearly, was responsive, understood the questions, answered in full sentences, and did not display slurring, hesitance, or difficulty finding words. Id. Dr. O'Donnell opines that Defendant was not experiencing a paradoxical reaction to lorazepam and that he exhibited no manifestations of benzodiazepine toxicity. Id. at ¶ 24. After reviewing the records, Dr. O'Donnell also noted that Defendant was prescribed alprazolam (Xanax), a benzodiazepine that is at least twice as potent as lorazepam. Id. at ¶ 22. Dr. O'Donnell suggests that Defendant then may have had some tolerance to benzodiazepines and thus been less susceptible to adverse effects of lorazepam. Id. at ¶ 23. Both Dr. O'Donnell and Dr. Killian state in their respective reports that the 'disinhibiting effects' of lorazepam refer not to loss of restraint or insight, but to so-called paradoxical reactions—that is rather than calming the person, the drug may make some patients more aggressive or violent. See O'Donnell Aff. ¶ 19; Killian Report 24.

The Court listened to the recordings of both interviews of Defendant during a break in the evidentiary hearing. The Court

noted that for the first few minutes of the hospital interview, Defendant did seem to be speaking slowly and softly, although the Court would not characterize Defendant's speech as 'slurred.'  At the evidentiary hearing, Dr. Regis testified that when he medically cleared Defendant for discharge—meaning that Defendant could be transported to jail—Defendant became highly agitated.  Dr. Regis surmised that that Defendant was malingering in order to delay his release from the hospital.  Although Dr. Regis did not note his opinion on whether Defendant was malingering in the medical records, Dr. Regis did note that when Defendant arrived at the hospital, Defendant was stuporous and did not respond to a sternal rub, but did appear to be protecting his airway.  This is additional evidence that Defendant was exaggerating his symptoms.  See Killian Report 23 (noting that Dr. Regis' note that Defendant was protecting his airway suggests that Dr. Regis suspected Defendant was malingering).  Finally, the Court notes that while Defendant's speech may have been slow and soft at first, as the interview progressed, Defendant's speech very quickly became stronger.  As the agents began to challenge Defendant, Defendant appeared to perk back up very quickly, with no noticeable impairment

whatsoever.  And rather than exhibiting signs of impairment or intoxication, when the agents began to challenge Defendant, Defendant began to push back—providing an alternative reason for why he was at the target home, why he planned to meet with Alexis, and why he had alcoholic seltzers and personal lubrication in his car.  The Court did not hear in the recording the "obvious impairment" that Defendant refers to.  Agent Roth also testified at the evidentiary hearing that at no point during his interaction with Defendant did he believe Defendant to be intoxicated.

In Defendant's Motion to Suppress, he also states that he had consumed medical marijuana earlier in the day prior to his arrest. Defendant contends that the cumulative effect of the medical marijuana and the lorazepam is significant to the Court's inquiry on voluntariness.  Mot. to Suppress 14 n.4 (citing to Dr. Skolly's report).  Dr. Skolly, however, in the section of her report entitled "Lorazepam's Mechanism of Action," states that "it is **possible** the Defendant was under the influence of tetrahydrocannabinol (THC), the active constituent of medical marijuana at the time of the alleged crime and during the two interviews."  ¶ 30 (emphasis added).  Dr. Skolly's opinions in her report, though, are limited to

the effects of lorazepam on Defendant.  <u>See</u> ¶¶ 33-34.  Although Dr.

Skolly notes generally that as a central nervous system (CNS)

depressant, marijuana can have cumulative effects in conjunction

with other CNS depressants like lorazepam, Dr. Skolly does not

offer any opinion on the cumulative effects of marijuana and

lorazepam as they specifically relate to Defendant.  Moreover, while

Defendant's drug screen at the hospital revealed the presence of

THC, Dr. O'Donnell's report clarifies that the drug screen only

confirms the presence of THC in Defendant's system, the drug

screen does not establish intoxication, and that any suggestion of

intoxication or impairment due to THC is speculative.  O'Donnell

Aff. ¶ 24(f).  Additionally, according to Dr. Pan's report, Defendant

has been using medical marijuana to treat his posttraumatic stress

disorder (PTSD) for the past three years.  Pan Report 13.  Dr. Pan's

report states that Defendant consumes approximately one ounce of

medical marijuana each week.  <u>Id.</u>  According to Dr. Killian's report,

just as Defendant likely had developed some tolerance to the effects

of benzodiazepines, Defendant also "had presumably adapted

psychologically to any sedating effect that marijuana might have

given him initially."  Killian Report 20.  Defendant has not

presented sufficient evidence that the presence of THC in his system had any appreciable effect on whether Defendant's <u>Miranda</u> waiver was knowing, intelligent, and voluntary.

While Defendant contends that the administration of lorazepam made Defendant particularly susceptible to the questioning agent's "coercive tactics," the only coercion Defendant points to are the agents' statements concerning whether or not Defendant would be able to go home that night.  Relevant here, "while a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible."  <u>United States v. Villalpando</u>, 588 F.3d 1124, 1128 (7th Cir. 2009); <u>see also</u> <u>United States v. Kontny</u>, 238 F.3d 815, 817 (7th Cir. 2001) ("Trickery, deceit, even impersonation do not render a confession inadmissible . . . unless government agents make threats or promises.").  To succeed on a false-promise claim, a defendant must show "that his interrogator made him a promise that was materially false and thus sufficient to overbear his free will."  <u>Villalpando</u>, 588 F.3d at 1128 ("The reason we treat a false promise differently than other somewhat deceptive police tactics (such as cajoling and duplicity) is that a false promise has the

unique potential to make a decision to speak irrational and the

resulting confession unreliable.").  Here, at no point did the agents

falsely promise Defendant that he could go home if he acquiesced to

the interview.  In response to Defendant's questioning on that point,

Detective Howard told Defendant that she "asked [her] boss" but

that she was just assisting another agency, so "it's not like I can

call my boss cuz' it's not my boss. . . I'm going to be straight with

you. I don't know if you're gonna go . . . if you will be able to go

home."  Arguably the closest Detective Howard came to suggesting

that Defendant might be able to go home that night was her

statement that "I think it's kind of depending on the outcome of—

you know, I don't know what you're going to say to me when I ask

you questions."  And even that statement—an example of the Reid

Technique—indicated at most only a possibility that Defendant

might have been able to go home depending on the answers

Defendant gave; the statement was not a promise that Defendant

would be able to go home if he spoke to the agents.

When read his <u>Miranda</u> rights, Defendant asked appropriate

questions to clarify his rights and then responded affirmatively

when asked if he understood those rights.  On these facts, the

Court finds Defendant's waiver of those rights was knowing and intelligent.  And in the Court's review of the recording, considering also the expert opinions rendered in this case, there is no evidence that Defendant was intoxicated—much less "obviously intoxicated"—or that the tactics employed by the agents were sufficient to establish that Defendant's will was overborne.  While Defendant had little familiarity with the criminal justice system, under the totality of the circumstances, there is not sufficient evidence that the administration of lorazepam to Defendant several hours earlier interfered with his capacity to make a knowing, intelligent, and voluntary waiver of his <u>Miranda</u> rights during the hospital interview.  In reaching this conclusion, the Court has also considered the fact that Defendant himself initiated the second interview and that Defendant was comfortable enough during the interview to correct the agents when they misstated facts.

## C.   Defendant's Statements During the Hospital Interview Were Voluntarily Made.

Next Defendant argues that his statements made during the hospital interview should be suppressed because the statements themselves were involuntarily made under the totality of the

circumstances.

The factors employed to evaluate the overall voluntariness of a statement are the same as those used to evaluate whether a suspect voluntarily waived his <u>Miranda</u> rights.  <u>Ruvalcaba v. Chandler</u>, 416 F.3d 555, 562 (7th Cir. 2005).   A defendant's statements to law enforcement officers are voluntary if they are "the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." <u>United States v. Gillaum</u>, 372 F.3d 848, 856 (7th Cir. 2004) (internal quotation marks omitted).  For a statement to be found involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment, coercive police activity must be present. <u>Id.</u>  "A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective."  <u>United States v. Toro</u>, 359 F.3d 879, 885 (7th Cir. 2004).

Defendant, in arguing that his statements made during the hospital interview were involuntary, notes that he had been administered lorazepam upon his arrival at the hospital.  But for the same reasons discussed above, the Court has not been

presented with sufficient evidence from which to find that

Defendant was intoxicated or impaired at the time of the interview.

To the contrary, Defendant appears lucid and coherent.  But, even

assuming that Defendant were intoxicated, Defendant would also

need to establish that his statements were coerced.  And again, for

the same reasons discussed previously, Defendant has failed to

show that his statements were coerced.  Therefore, even though

Defendant had been administered lorazepam several hours prior,

his statements to the agents at the hospital were not involuntary

and need not be suppressed.

**F.   Defendant's Consent to Search His Electronic Devices was
Knowing, Intelligent, and Voluntary**

For the same reasons that Defendant urges the Court to

suppress his statements made during the hospital interview,

Defendant also urges the Court to suppress any evidence recovered

from the search of Defendant's electronic devices based on

Defendant's consent to search obtained during the hospital

interview on the basis that the consent to search was not knowing,

intelligent, and voluntary.

Whether consent to search is voluntary is also a question of

fact dependent upon the totality of the circumstances.  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).  Factors to be considered in determining whether consent to search was voluntary include: "(1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent." United States v. Santiago, 428 F.3d 699, 704-05 (7th Cir. 2005) (quoting United States v. Raibley, 243 F.3d 1069, 1076 (7th Cir. 2001) (alterations omitted).  As before, whether Defendant was intoxicated at the time he gave his consent to search is but one factor to consider in the analysis.  See United States v. Scheets, 188 F.3d 829, 839-40 (7th Cir. 1999) (citing United States v. Gay, 774 F.2d 368, 377 (10th Cir. 1985)) ("The mere fact that an individual is intoxicated does not render consent involuntary.  It is simply another factor to be taken in consideration when assessing the totality of the circumstances in considering the voluntariness of consent.").

Here, as before, Defendant did not have much experience with law enforcement and he was in custody at the time he gave the agents consent to search his electronic devices. But Defendant's consent to search, which came midway through the hospital interview, was not the result of repeated requests by the agents, nor did the agents use physical coercion to obtain Defendant's consent. Rather, when the agents asked Defendant if they could search his cell phone and camera, Defendant again asked appropriate questions to determine the scope of the search. Defendant indicated that the agents might find (presumably compromising) images of him and his girlfriend, which the agents stated they were not interested in. Defendant asked the agents if they were looking for "girls that are younger age or something like that?" and when the agents responded that they were, Defendant said "[y]eah, no go right ahead." Defendant was then presented with a consent to search form, which was read to him and he signed. Again, Defendant did not display any evidence of intoxication or impairment when he gave his consent. Accordingly, there is no basis on which to suppress the search of Defendant's cell phone and camera.

### III. CONCLUSION

For the foregoing reasons, Defendant Rafael Mercado Berrios'

Motion to Suppress Statements and Evidence (d/e 47) is DENIED.

ENTER: June 1, 2021

*/s/ Sue E. Myerscough*
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE